You may announce the case 312-0366 Stanley and LaVon McCombs appellant Steve Wood vs. J. Kevin Paulsen MD in the Furious Surgical Group Appellees Ravel, Victoria Mr. Wood Good morning Good morning Can I please have the clerk? Counsel? My name is Steve Wood and I represent Stan and LaVon McCombs in their case for you today. Stan underwent a gastro-jejunctomy on May 2004 performed by Dr. Paulsen who is the defendant in the case. As a result of complications from the surgery Stan brought suit against Dr. Paulsen alleging A that the surgery should not have been performed and B that it was performed incorrectly. In June 2011 this case went to trial and the defendant prevailed. My client did not receive a fair trial for two reasons. One of which plaintiff's counsel was unable to cross examine defendant's expert 213F3 expert on materials he reviewed and relied upon as a basis for his expert opinions. And two the jury was not properly instructed. I'd like to start with the 213F3 review issue first and of course I take any questions from the court at any point. As you probably saw from our brief we relied heavily if not entirely on this court's decision in Jackson v. Reed. It's actually the same law firm's very similar issue and it's our belief that the court's ruling should be the same. Dr. Paulsen chose to be the 213F3 witness in this case and testified that as to the standard of care and that he met the standard of care. He was disclosed as a 213F3 witness as I mentioned. As such, as this court held in Jackson, he's not afforded any protections or privileges that other 213F3 witnesses are provided. They did not have to disclose him as a 213F3. They had two other 213F3 expert witnesses, Dr. Howard and Dr. User. They made that tactical decision. As such, under the case law, Leonardi, other cases cited by us in our brief, plaintiff's counsel is allowed to question expert witnesses even if they are parties as to materials they reviewed and relied upon. Actually, the facts in this case are even stronger than they were in Jackson and some of these other cases. Leonardi and Jackson were just materials in which the expert witness, the defendant, reviewed materials prior to his testimony. In this case, Dr. Paulsen testified unequivocally that not only did he review these summaries of depositions provided to him by his counsel, but he also relied upon them for his expert opinions. We have excerpts in our brief and, of course, there are references to that in the record. I think what we need to talk about here, which is key, is if these summaries of depositions, transcripts, had been produced to another 213F3 witness, whether it was Dr. Howard or Dr. User, I don't think there would be a question that they would have to be produced to plaintiff in this case. There was another issue in this case. There was a timeline that certainly would qualify under work product written by defense counsel provided to another expert, Dr. Howard, which was turned over to us, as it should have been, because that went to Dr. Howard's opinion. In this case, the summaries of the depositions, well, first of all, and this is in our brief, but just a point, we, the 213 interrogatories, 237B, request for any materials that Dr. Paulson reviewed or relied upon for his expert opinion. In their disclosures, they talked about deposition transcripts that he reviewed, and they listed a number of them. Once we got to trial, it became really apparent, and this is unequivocal, that Dr. Paulson never actually saw deposition transcripts, he saw summaries. He testified, I have never seen transcripts of summaries provided by my counsel. Well, trial counsel for us, Mr. Weiler, of course, filed a motion to compel to get the summaries so we could cross-examine Dr. Paulson on the contents therein. Defendant objected as to various privilege, and the court, first finding that attorney-client privilege applied, denied our motion, and then the next morning, actually, not only did the attorney, after an in-camera review of the summaries, also found that work product applied. Whose deposition transcripts are these that you're talking about? Well, first of all, there are a number of them that, and Dr. Wu specifically was mentioned by name as a transcript that he reviewed and relied upon. The other ones he refused to, he answered more generally, and I think even if you look in the defendant's statement of facts, they'll admit that he reviewed and relied upon summaries of various deposition transcripts. You didn't have any of those depositions to look at yourself, though. We had all the depositions. Oh. And can I address that point? Yes. And why that's important, because that's something the defendant will obviously go on. You could have cross-examined him on the deposition transcripts, which I understand the way you're looking at me, that you'd like me to address that, is actually, it's case law cited by the defense in this case, which is the Bucyrus or Consolidated Pull of the Bucyrus. They talk about the difference between the actual transcript and a summary provided by counsel. And they said, what counsel saw fit to write down regarding witnesses' remarks, the statement would be, the attorney's language permeated with inferences, and then they said in another case, Henry Grand Jury Investigation, notes of conversation with witnesses are so much a product of the lawyer's thinking and so little probative of the witness's actual words. Now, normally they would argue this goes to their point, where they're saying, well, you can't get what we're thinking with the work product. But I think it goes the other way on this issue. Dr. Paulson says he relied on these summaries to come to his opinion. And the trial court actually agreed with that. They said, we will agree that Dr. Paulson reviewed and relied upon all the materials he was provided, including the summaries. Now, if these summaries were really the creation, and we've not seen them, they're sealed. If these really were filled with inferences or whatever, what have you, by defense counsel, then that's what he's relying on. He's relying on his defense counsel's own impressions or things like that for his expert opinions. And in one way or another, it's either there's inferences in there that he's relying on to create his own opinion, or maybe they're picking just selected excerpts and not putting in parts of the deposition that is bad for them and things of that nature. The point being, the case law is clear. And this court in Jackson made it clear that a 213-F3 witness who's also a party is not a separate category. And I think that was the takeaway from Jackson. Directly from this court, neither the case law nor Supreme Court Rule 213 provides authority for the proposition that the cross-examination of a controlled expert who's also a party should be less rigorous than cross-examination for any other expert. And Jackson referenced this situation. In that case, the trial court and this court found that the trial court essentially created another category of witnesses, this 213-F3 that's a party, as opposed to just a 213-F3, which is what the Supreme Court rules are. And in this case, the trial court, by the excerpt that I just referenced, did the same thing. They said that we take for a fact the fact that he relied on these summaries, but we're not going to make them turn them over because he's a party. And I think that's what we have to talk about. Again, they elected to name him a 213-F3. They had two other ones. As such, he's talking about the standard of care. 213-F3, you're sounding like an accountant. What is it? Well, it's about expert opinion witnesses. Okay. I don't speak English. Oh, sorry. An expert opinion witness testifying on his own behalf. Right. And, again, I think another thing that's important, and I briefly referenced it earlier, is there is a work product document, clearly work product, that they produced to us in this case, that they produced to Dr. Howard. And that was just a timeline of medical. And they produced it because they should, because he's a 213-F3 witness, and he got it from the council, and he used it to form his own opinions in the case. Again, I'll move to my next allegation of error. I have one question before you do so. Sure. Did Dr. Paulson testify that he relied on anything other than the summaries of the depositions before reaching his opinion? Oh, yes. He relied on all the materials he was provided. He was provided lots of materials. I mean, there was a number of things that went into his opinions. I'm quite sure there was a lot of it. But, again, under Leonardi and these other case laws, we're allowed to question. You've answered my question. Thank you. Let me ask you a question also. Did the trial judge review the summaries? He did. He made the initial ruling finding that they were attorney-client privilege on one day. It's my understanding that the next morning he reviewed them in camera and found that work product privilege also applied. Yeah, he did at some point. We've not seen them, of course, under seal. But he did review them at some point. Again, on this issue, we feel that our case is even stronger than the one in Jackson that prevailed in this court found to be creating an unfair trial because not only did Dr. Paulson review these summaries, he relied upon them according to his own testimony. Our next allegation of error is the 501 missing witness instruction and or inference. Plaintiffs sought a 501 instruction because defendants didn't call two of their employees who participated in Stan's care at the relevant times with Drs. Gupta and Crawford. Dr. Crawford actually treated Stan in the two days directly leading up to the decision. Dr. Paulson's due to gastrofusionostomy. So his testimony would have been brought had it been favorable because, of course, the case was the decision whether or not to even do the surgery. So that's Dr. Crawford. As to Dr. Gupta, there's reference in both our brief and their response. There was initially an agreement among the counsel that we would not seek a 501. As to Dr. Gupta, because the testimony would be that Dr. Paulson had not discussed Stan's care and whether or not to do the surgery with Dr. Gupta, and that was what Dr. Paulson represented, I believe, a deposition. But once we got to trial, Dr. Paulson testified, yeah, I did talk to Dr. Gupta about Stan's care during those days. So then the condition precedent for our agreement, if you want to call it that, was gone, and we did seek the 501 on Dr. Gupta. The court denied this, we feel unjustly in the reasons that are set out in our brief, but they even went a step further and didn't allow plaintiff's counsel to even argue the adverse inference in the closing argument, which was an error and prejudiced the plaintiff. Real quick, I want to touch on the subject matter jurisdiction argument that the defendant raised in their response. This would be a miscarriage of justice if this were somehow allowed, considering the circumstances we lay them all out in our reply brief as to the timing of everything this court actually had a chance to take that issue up on interlocutory appeal and turned it down, but the issue was we initially named Dr. Wu as a defendant because that's the support we believed at the time, named Dr. Paulson as a respondent in discovery in the case. After medical expert reports came in that Dr. Wu was basically left in a no-win situation because of the performance of Dr. Paulson, we allowed Dr. Wu to be dismissed. We moved to convert Dr. Paulson from a respondent in discovery to a defendant, and the defendant noticed that up for sometime in October. Then the Dr. Wu defendant noticed their motion for dismissal the same day. We didn't fight that because the evidence had shown that he was not at fault. Actually, it's interesting because the Dr. Wu counsel at the time is now the same counsel that is representing Dr. Paulson. Dr. Paulson's old counsel moved for an extension to respond to our motion to convert. It was granted by the court. They proceeded to break that extension. Anyway, at some point the court allowed the motion to convert. Now they're coming back saying that the court lost subject matter jurisdiction. If you look at the fact pattern, if you look at the cases that we cited, that would be a miscarriage of justice if that were somehow allowed. I'll take any more questions, but other than that, I'm done. Thank you. Thank you. Thank you. Mr. Pretorius? Thank you, Madeline. You're welcome. May it please the court. My name is Merville Pretorius, Jr. I represent Dr. Paulson, Peoria Surgical Group. I will start with what I think is the dispositive issue in the case, and that is subject matter jurisdiction. To jump ahead of myself, I'm saying subject matter jurisdiction, not personal jurisdiction. That has been somewhat confused in the briefing. Subject matter jurisdiction, if lacking, robs the court of all power to act, from the point that jurisdiction stops existing. There are a couple of dates that are important. I am not going to respond to this request for continuance. I was not Paulson's attorney. My office was not at that time. My only kind of an aside comment is that a respondent in discovery, as a respondent in discovery, has no standing to request any type of plea. He's not a partner. The court has personal jurisdiction over him for discovery only. He used the phrase that Paulson, through his then counsel, moved for a continuance. I don't see any motion. I can't say what happened in the discussions. I don't know. I'm not disputing what he says. I think he's probably saying what he believes to be true. But I don't know whether it is or not, and it doesn't appear in the pleadings, that anybody requested a continuance of the motion to convert. In any event, the only defendant in the case was dismissed on October 3rd. At that point, the case for controversy ceased to exist. Fifty-six days later, the plaintiff came back and had an order-entered converting policy. At that point, we contested it. The Bogsath case is so closely on point that it's unmistakable. In that case, and in a couple of others that were consolidated, the plaintiff had named, quote, John Doe, fictitious defendants, and then a number of respondents in discovery. And the court very clearly held that this was improper. And I'm quoting. Suits against fictitious parties are void ab initio, which is one of those things that we looked up in our Blacks Law Dictionary many years ago. It means, of course, from the outset. And any order entered after that day is of no effect. And the court went on. Underlying this prohibition is the tenet that a court only entertains subject-matter jurisdiction over justiciable matters or matters in controversy between an actual plaintiff and an actual defendant. On October 3rd of 2006, this case assumed the same posture as the Bogsath decision. The Bogsath case was decided in 1995. On October 3rd, when the plaintiff consented to a dismissal with prejudice of the only defendant in the case, there was no further controversy. There was no case in existence. We, of course, sought to appeal. The trial court agreed. This court did not accept the appeal. That issue is dispositive. As strange as it sounds, we did go on for a number of years with a trial court that had no power. Fifty-six days had elapsed without a defendant when there was no case or controversy in existence. Now, does that seem harsh? Statute of limitations are harsh. They are absolute rules. Now, I want to move on to the privilege issue. Let me address a procedural point. You have not filed a motion to dismiss in this court. You've chosen to simply argue jurisdiction. We are not questioning this court's jurisdiction, though I guess we probably should if the trial court didn't have jurisdiction. That's what I'm thinking, and I'm wondering if it's a point that we've debated when preparing for this case, that there is not a motion to dismiss here. And if the suggestion is that we have waived it, you cannot waive subject matter. Right, the court can raise it on its own. And nobody can waive it. There's no cross-appeal here. Right. All right. That was our thinking. This is not something that can be waived. All right. You've answered my question. Okay. Now, moving on, and we all agree that's a de novo review. Now, the privilege issue, what's at issue here is work product. The Reid case does not apply. In Reid, you specifically found that the work product privilege did not apply. The documents were not work product. They are work product here. The judge found that, and I only have to tell you a couple of salient facts. I don't know how many depositions there are I should have checked. There's 16 or 18. They're anywhere from 30 to 100 pages long. These summaries are two to three pages. That is work product. That is the attorney taking and condensing testimony into a shorter version. As the cases have continuously held, memorandums created by attorneys that are not verbatim, the transcripts are verbatim, the memorandums are not, are work product. And I will tell you that the work product privilege should apply regardless. Consolidated coal, the Malinarski case, is set out in our brief. And I want to just read a quote from that. This dealt with memorandums of interviews of witnesses, witnesses who had not been deposed. These are witnesses that were called at trial, had never been deposed. The one attorney had memorandums of his own interviews. And the court said, Therefore, in accordance with consolidation coal, the memorandum is protected by the work product privilege unless the plaintiff can show that it is impossible to obtain the factual material, factual information contained in the memorandum. The plaintiff has not made such a showing. The plaintiff's attorney admitted that at the time, that the names and addresses of all witnesses were available to him and that he could depose any or all of those witnesses himself. In this case, not only were the names and addresses of the witnesses available, the deposition transcripts were all available. There was no factual information that was withheld from plaintiff's counsel. The unique thing about this case is, when you have the transcripts and you have the memorandum that were created by myself or my associates at the time of the deposition, the factual material is all here. The only thing that is here is work product. The attorney's synthesis... I won't try. The attorney's consolidation and selection of what's pertinent and what isn't pertinent. And if you'll stop for a minute and imagine a trial where the attorney has those, all the questioning would be, why did the attorney include that and not something else? Why did your attorney do this? This would be, in effect, an impeachment cross-examination of opposing counsel for his thought processes. Every piece of factual information was available. Isn't it pretty efficient cross-examination for counsel to say, you formulated a medical opinion without reading the entire deposition? Yes. I mean, he did it here. They didn't really do it in the courtroom. So, doctor, you relied on your own attorney's representation of what the facts were? In addition, the reason I asked the question about were there other materials provided, this isn't an attempt to frustrate the rule by summarizing depositions in a law firm to prohibit effective cross-examination. There were other materials that the doctor could have been cross-examining. Medical records that were this thick. And he had all the depositions. It's true he said that he didn't choose to read them. Now, the last thing I'd like to discuss here is the missing witness instruction. I think there's several important points here. Number one, there was an agreement. Secondly, the Petrillo Doctrine implicates this entire argument. First, the agreement was to the effect that neither side would take unfair advantage for Dr. Gupta not being present at trial. I set out the agreement in the motion in limine, very clearly. And it said that Dr. Paulson will not testify that he relied on statements of Dr. Gupta. We had a hearing on the motion in limine. We had an order in. Plaintiff's counsel never said anything about my recitation of the agreement being incorrect in any fashion. Dr. Paulson then said, and he must have said it seven or eight times, it's set out in the briefs. I probably talked to him. At one point he said, I talked to him. I have no recollection of anything that was said. The agreement was complied with on our part. There wasn't even the suggestion of an agreement. And I think Judge Shore, an extremely experienced trial judge, took the whole situation and tried to do what was fair. Nobody had gained any advantage. Nobody had gotten anything out of it. Now, you should also know that in a way, Dr. Gupta had testified. There was a consultation report in the medical records where he had examined the patient and put some opinions in. All the experts referred to that. That was repeatedly put before the jury. But, of course, Dr. Gupta did not testify. We did not keep him from going to Greece. And there was some comment in the plaintiff's brief, how did we know if we complied with Petrillo that he was leaving town? I represent the corporation. They schedule all the doctors. They know when they're going to be leaving town. Now, Petrillo, implicit in the missing witness instruction is a decision made by one of the parties not to call the witness. Implicit in the missing witness instruction is the inference that that person did it knowing that that testimony would not be helpful. This is something that's new. So far as I know, no court has ever considered the missing witness instruction in the context of a medical case where one of the attorneys and only one of the attorneys is barred from talking to the potential missing witness. We don't know what he would testify to. We have no idea. We never talked to him. There's no suggestion that we did. We have never done that. His deposition was never requested by plaintiff's counsel. Nobody knows what he would testify to. Nobody gained any advantage from him not testifying, and the court was correct in keeping the status quo and, in effect, finding that the agreement that was set out in the motion in limine was met. Counsel has two minutes. Thank you. Dr. Crawford, there is nothing in this record other than the fact that he covered. We don't know when. Dr. Paulson said one reference to Crawford is a mistake. That was me. Welcome to the electronic age, meaning the medical records librarian had made a mistake. In another instance, he said he may have covered. We cover for each other on weekends. He may have seen the patient. That is it. Now, plaintiff's counsel had looked through the record. There were many other doctors from our group that covered on weekends, that saw the patient. Simply because his name comes up and they show that he's an employee does not entitle him to the instruction. There must be a foundational showing of a likelihood that this witness has pertinent information, and there should be no inference that one side is withholding something when that side has no access to know whether they're withholding something or not. So I think the overriding issue in this case is jurisdiction. The facts are very clear. There was 56 days without a case or controversy in existence. I would ask. Yes? I have a quick question. Did Dr. Gupta's medical notes make it into evidence for the jury to consider? Yes. And same with Dr. Crawford? Yes, ma'am. That's okay. We agree that all records, all the hospital records, would be admitted into evidence  Okay. Okay? Thank you. Thank you. Just briefly, and of course any questions. I'll go backward to forward. They talked about the missing witness and the Petrillo Doctrine. The Petrillo Doctrine, first of all, Kearns v. New Lennox, which we cited in our briefs, talked about the employees of defendant by its very nature are more accessible to the defendant. These two doctors, Crawford and Gupta, worked for the Peoria Surgical Group, a defendant, in the case. And also, in terms of this agreement about Gupta, the agreement was that Dr. Paulson would testify, as he represented in his deposition, that he had not talked to Dr. Gupta during the relevant time period, which is early May, when they were deciding to do this gastrointestinal. On the stand at trial, he changed his testimony saying, yes, he did talk to him. Did he say he actually talked to him, or he may have talked to him? Was he very definitive? That's a good question. I'd have to check myself. I thought he said that he did talk to him. Okay. I don't have the exact full rate in front of me. If he said he may have talked to him, would that change your argument? Not the principle of it. No, I mean, it certainly would be strengthened if he said he absolutely did. But I think you might have to see it. I thought he said that he did, based on my recollection of it. If you go back to the work product issue, from our perspective, it's as simple as this, these two- to three-page summaries. If they were produced to Dr. Howard or Dr. Uzer, the other 213F3 witnesses, they would be turned over, work product or no. And that's the main point, because in Jackson, and in the Illinois Supreme Court rules, there is no differentiation between a 213F3 or expert witness. Whether it's a party or a retained expert. And that's the difference. They very well may be work product. We've not seen them. By all accounts, they are. But they were used by an expert witness to come to his opinions in the case. He said he relied upon them. The court accepted that, that he relied upon them. And again, the court shows that he was given additional privileges because he was a party. And under Jackson v. Reed, this court held that you're not. Once you say you're a 213F3 expert witness, you're just like the other 213F3 expert witnesses. Now you go back to the first category, the subject matter jurisdiction. I would just urge the court again, I know you have, to just read the timeline in the reply brief as to how all this came about. Our motion to convert Dr. Paulson to a defendant was on file well before Dr. Wu was released in this case. The counsel who represented Dr. Paulson now represented Dr. Wu at the time. So I guess what they're telling you is they would have liked us to hold on to a doctor, their client, who we knew that he didn't do anything wrong, while we waited for the new counsel for Dr. Paulson, or whatever, the Dr. Paulson, to get their motion to convert on file. And again, I urge the court to just read the timeline of how everything went down. Again, I appreciate everything for your time today. Thank you. Thank you very much. We will be taking the matter under advisement, adjourning for a brief conference, and then we'll be back in to get the next case.